Filed 10/7/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | D083765 |
| Plaintiff, Cross-defendant and Respondent, | (Super. Ct. No. 37-2017-00044935) |
| v. | |
| CURTIS DIBLIN et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge. Affirmed.

Estes Law Group and Polly J. Estes for Defendant, Cross-complainant and Appellant Curtis Diblin.

Higgs Fletcher & Mack, John Morris and Steven M. Brunolli for Defendant, Cross-complainant and Appellant Monee Gagliardo.

Pacific Law Partners, Jenny J. Chu, John T. Meno; Musick, Peeler & Garrett, David A. Tartaglio, Steven J. Elie and Michelle C. Ferrara for Plaintiff, Cross-defendant and Respondent.

# I.

## INTRODUCTION

Appellants Curtis Diblin and Monee Gagliardo challenge a judgment entered in favor of respondent State Farm Fire and Casualty Company (State Farm) in this insurance coverage dispute. State Farm issued Diblin a homeowners policy that covered injuries arising from an "occurrence," which the policy defined as "an accident." While the policy was in effect, Diblin attacked Gagliardo, who was one of his housemates, by striking her over the head with a mallet multiple times. Gagliardo sued Diblin to recover economic and noneconomic damages. A jury found in her favor on two theories of liability and awarded her more than $2.5 million dollars in compensatory damages.

Before the jury's verdict in the underlying action was reduced to a judgment, State Farm filed this declaratory relief action against Gagliardo and Diblin. State Farm sought a determination that it owed no duty to indemnify Diblin for the amount of Gagliardo's judgment. After reviewing the pleadings, the jury instructions, and the special verdict form, the trial court determined the findings of the jury in the underlying action conclusively established that Diblin's injury-producing conduct was not the result of an "accident," and Gagliardo's damages therefore did not arise from a covered "occurrence" under the policy. The court entered judgment in favor of State Farm on its complaint for declaratory relief.

On appeal, Diblin and Gagliardo contend the trial court erred in interpreting the findings of the jury in the underlying action and in concluding the underlying damage award is not covered by Diblin's policy. We affirm.

II.

BACKGROUND

A.  *The Injury-Producing Event and Diblin's Criminal Prosecution*

In May 2015, Diblin and Gagliardo were housemates and friends.  On the morning of May 23, 2015, Gagliardo visited Diblin in his bedroom to use his coffee machine and computer, as she had done on other occasions. Gagliardo sat in a chair to check her e-mail while Diblin stood behind her. "All of a sudden," Gagliardo felt something that made her think "the ceiling fell down on [her] head."  After a moment, she realized Diblin was beating her over the head with a rubber mallet.  Diblin struck her multiple times.

Police arrested Diblin, and he was criminally prosecuted.  He ultimately pled guilty to one count of assault with intent to commit a sexual crime and admitted great bodily injury and dangerous weapon enhancements.

B.  *The Pleadings in the Underlying Action*

On November 6, 2015, Gagliardo filed a civil action against Diblin in *Gagliardo v. Diblin*, San Diego Superior Court case No. 37-2015-00037520 (*Gagliardo v. Diblin* or the underlying action).  In her first amended complaint, Gagliardo asserted causes of action for sexual assault, sexual battery, gender violence (Civ. Code, § 52.4), violation of the Ralph Civil Rights Act of 1976 (Civ. Code, § 51.7; the Ralph Act), violation of the Tom Bane Civil Rights Act (Civ. Code, § 52.1; the Bane Act), sexual harassment, and negligence.  Each of the first amended complaint's seven causes of action, including the claim for negligence, asserted entitlement to relief based on the same asserted conduct–Diblin's attack on Gagliardo.

For example, as to the negligence cause of action, the first amended complaint alleged Diblin "breached [the] duty of care" he owed to Gagliardo

3

"by battering and sexually assaulting" her, as set out in other paragraphs in the pleading. In those referenced paragraphs, Gagliardo alleged Diblin, "came up behind her, without provocation, and began bludgeoning her in the back of the head with a hardened rubber mallet" approximately "three [to] five times." Gagliardo further alleged Diblin "dragged" her "from the chair and threw [her] on the floor," after which he "punched her in the head with a closed fist." According to the allegations, Diblin also "removed [Gagliardo's] robe and groped her right breast," and then "kissed [her] left cheek." Gagliardo additionally alleged that when she attempted to get away, he "grabbed [her] in a wrestling hold and laid on top of her on the bed."

Gagliardo alleged she suffered a variety of physical and emotional injuries "due to the sexual harassment, battery, and assault she suffered at the hands of Diblin" (some capitalization omitted). In addition, she alleged Diblin's "aforementioned conduct" "was done with malice and intent to injure," such that she was entitled to punitive damages.

The first amended complaint alleged no other factual or legal basis for the negligence cause of action. The complaint made no mention of Diblin's use of prescription testosterone, nor did it assert a breach of due care involving the failure to monitor or warn of the side effects related to the testosterone medication Diblin was prescribed.

The operative pleading at the time the jury rendered its verdict and judgment was entered was the first amended complaint.

C. *The Policy*

Diblin tendered the underlying action to State Farm under Homeowners Policy No. 03-BZ-A489-7 (the Policy).

The Policy provided Diblin liability coverage under the following language:

4

"SECTION II – LIABILITY COVERAGES

"COVERAGE L - PERSONAL LIABILITY

"If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence, we will:

"1.  pay up to our limit of liability for the damages for which the insured is legally liable; and

"2.  provide a defense at our expense by counsel of our choice.  We may make any investigation and settle any claim or suit that we decide is appropriate.  Our obligation to defend any claim or suit ends when the amount we pay for damages, to effect settlement or satisfy a judgment resulting from the occurrence, equals our limit of liability.

The Policy defined an "occurrence" as follows:

"FE-3419
DEFINITIONS

"Definitions 6. and 7. are replaced by the following:

"[¶] . . . [¶]

"7. 'occurrence', when used in Section II of this policy, *means an accident*, including exposure to conditions, which first results in:

"a.  bodily injury; or

"b.  property damage;

"during the policy period.  All bodily injury and property damage resulting from one accident, series of related accidents or from continuous and repeated exposure to the same general conditions is considered to be one occurrence."
(Italics added.)

In Section II, the Policy also included an exclusion for damages caused by willful or intentional conduct:

"SECTION II – EXCLUSIONS

"1. Coverage L and Coverage M do not apply to:

"a. bodily injury or property damage:

"(1) which is either expected or intended by the insured; or

"(2) which is the result of willful and malicious acts of the insured."

State Farm accepted Diblin's tender and agreed to provide a defense, subject to a reservation of rights.

D.     *The Trial and Outcome in* Gagliardo v. Diblin

1.     *The Evidence*

The *Gagliardo v. Diblin* action proceeded to trial in January 2018. Gagliardo testified about the attack consistent with the allegations of the first amended complaint. As she testified, the attack was "a sadomasochistic beating" and "an attempted rape."

Diblin's videotaped deposition was introduced at trial. He described his view of what happened the morning of the attack and admitted that he had used a mallet to hit Gagliardo on the head three times in quick succession. Diblin denied all of Gagliardo's allegations that the attack involved sexual touching or that he had made sexual comments or engaged in other behavior that could have been interpreted as sexual in nature, such as trying to take off his own shorts. He indicated he pled guilty to the charge of assault with intent to commit a sexual offense because he was facing multiple serious

6

charges, and he admitted to an offense that would result in a lesser sentence than if he were to be found guilty of the charged counts.

Diblin also called Dr. Alan Abrams, a forensic psychiatrist, to support his defense. Dr. Abrams acknowledged that Diblin admitted having hit Gagliardo. Dr. Abrams opined that Diblin's violent behavior that morning was due to a "hypomanic episode attributable to the external testosterone" Diblin was taking as part of his treatment for prostate cancer. It was his view that Diblin "flew" into rage due to his testosterone-induced "irritable, agitated, hypomanic state."

2.    *The Jury Instructions*

The court instructed the jury in connection with each of six theories of liability that corresponded with five of the causes of action asserted in first amended complaint: sexual assault, sexual battery, gender violence, violation of the Ralph Act based on threats of violence, violation of the Ralph Act based on acts of violence, and negligence.[1] The jury was not asked to decide whether Diblin committed a battery or other intentional tort beyond the sexual and/or gender violence based intentional torts asserted in the first amended complaint.

As relevant to this appeal, the court instructed the jury that it could find Diblin liable for Gagliardo's injuries in connection with the gender violence cause of action (Civ. Code, § 52.4) if it found true all of the elements of either of two different theories of liability for gender violence. The instruction provided:

---

[1]    Jurors were not instructed as to Gagliardo's claims for violation of the Bane Act (Civ. Code, § 52.1) or sexual harassment (Civ. Code, § 51.9), even though those causes of action had been alleged in the first amended complaint.

7

"Monee Gagliardo claims that Curtis Diblin committed an act of gender violence against her. To establish this claim, Monee Gagliardo must prove all of the following:

"1. Curtis Diblin's conduct constituted a criminal act under California Law.

"2. An element of that criminal conduct by Curtis Diblin was the use, attempted use, or threatened use of physical force, and

"3. The criminal conduct of Curtis Diblin was committed, at least in part, based on the gender of Monee Gagliardo.

"OR

"1. Curtis Diblin's conduct constituted a physical intrusion or invasion upon Monee Gagliardo,

"2. The physical intrusion upon Monee Gagliardo was sexual in nature, and

"3. The physical intrusion upon Monee Gagliardo was conducted under coercive conditions."

In connection with the intentional tort theories of liability, the court also instructed the jury on the question of Gagliardo's entitlement to punitive damages. That instruction read:

"If you decide that Curtis Diblin's conduct caused Monee Gagliardo harm, you must decide whether that conduct justified an award of punitive damages. At this time, you must decide whether Monee Gagliardo has proved by clear and convincing evidence that Curtis Diblin engaged in that conduct with malice, oppression, or fraud. The amount of punitive damages, if any, will be decided later.

" 'Malice' means that Curtis Diblin acted with intent to cause injury or that Curtis Diblin's conduct was despicable and was done with a willful and knowing disregard of the

8

rights or safety of another. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences.

" 'Oppression' means that Curtis Diblin's conduct was despicable and subjected Monee Gagliardo to cruel and unjust hardship in knowing disregard of her rights.

" 'Despicable conduct' is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

" 'Fraud' means that Curtis Diblin intentionally misrepresented or concealed a material fact and did so intending to harm Monee Gagliardo."

As also relevant to this appeal, the court instructed the jury on Gagliardo's claim for negligence by telling jurors the following:

"Negligence is the failure to use reasonable care to prevent harm to oneself or to others. A person can be negligent by acting or by failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. [¶ You must decide how a reasonable careful person would have acted in Curtis Diblin's situation."

3. *The Jury's Verdicts and Entry of Judgment*

The jury was asked to make specific findings as to each of the causes of action. With respect to each theory of liability that required a finding of sexual touching or sexual intent, the jury declined to find Diblin liable. However, the jury found in Gagliardo's favor on two theories of liability:

9

(1) that Diblin had committed an act of gender violence against Gagliardo, and (2) that he had acted negligently, which caused her harm.[2]

As instructed, the jury was also asked to decide whether Gagliardo was entitled to a punitive damage award, but it was not asked to decide what the amount of any punitive damages should be. In response to the punitive damage questions, the jury found that Diblin "engage[d] in the conduct with malice," and "engage[d] in the conduct with oppression," but did not find he "engage[d] in the conduct with fraud."

The jury awarded Gagliardo compensatory damages of $2,514,500 for past and future economic and noneconomic losses. After the jury verdict was read, Gagliardo waived her right to punitive damages.

A final judgment was entered in the *Gagliardo v. Diblin* action on February 8, 2018.

4. *Postjudgment proceedings in* Gagliardo v. Diblin

Diblin initially requested that State Farm continue to provide a defense by funding an appeal from the judgment in the underlying action. State Farm agreed to fund an appeal. However, Diblin and Gagliardo settled the underlying action. As part of the settlement, Diblin assigned to Gagliardo his contract and bad faith rights under the Policy.

More than four years after final judgment was entered in the underlying proceeding, Gagliardo filed a document titled "Second Amended Complaint" in the trial court. The record does not reflect that Gagliardo moved for or received leave of the court to file this document.

---

[2] As previously described, the jury was instructed that to establish a claim for gender violence, Gagliardo would have to prove one or both of two sets of elements. The jury found true all three of the *first* set of elements.

The document identified as a second amended complaint is in large part identical to the first amended complaint. The only major difference appears in paragraph 54, which is part of the negligence cause of action. The new version of this paragraph retained the allegation that Diblin "breached his duty of care to Plaintiff by losing self-control and battering and sexually assaulting the Plaintiff, as set forth in paragraphs 7-17 herein-above." But paragraph 54 in the new document also included the additional allegation that Diblin "breached the duty of care by being mindful [sic] of the side effects of using prescribed testosterone . . . and failing to seek further medical assistance" despite "feeling out of sorts mentally and physically." It further added the allegation that Diblin breached the duty of care by failing to "keep adequate distance" from Gagliardo "and/or advising [her] that he was not feeling comfortable in his body . . . all of which was a proximate cause of the harm he caused to Plaintiff." The remainder of the allegations in the second amended complaint's negligence cause of action were the same as in the first amended complaint.

E.    *The Proceedings in This Action*

Meanwhile, on November 27, 2017—before the *Gagliardo v. Diblin* action was reduced to a final judgment—State Farm filed a complaint for declaratory relief against Gagliardo and Diblin. State Farm sought adjudication of its obligation to pay Gagliardo for any judgment she recovered from Diblin in the underlying action.

Approximately a year later, Gagliardo filed a cross-complaint against State Farm for breach of contract and bad faith, and Diblin eventually filed his own cross-complaint, alleging a cause of action for bad faith.

11

The parties stipulated to bifurcate their dispute, with the first phase to involve a bench trial on State Farm's declaratory relief cause of action. This phase proceeded to trial on November 21, 2022.

The trial court admitted in evidence four items: (1) the first amended complaint in the *Gagliardo v. Diblin* action; (2) the jury instructions provided in that action; (3) the judgment, including the special verdict form; and (4) the Policy. The court heard extensive argument from the attorneys.

At the conclusion of the parties' presentations, the trial court determined that State Farm had "proven its entitlement to a judicial declaration that it had no duty to indemnify Mr. Diblin for the judgment entered in the Underlying Action." The trial court found that Diblin's liability in the underlying action did not arise from an "occurrence" as is required for coverage under the Policy, and also found in the alternative that even if coverage under the coverage provision were assumed, the Policy's exclusion for damages caused by willful or intentional conduct and/or Insurance Code section 533 eliminated the possibility of indemnification for the damages awarded in the underlying action.

The trial court entered a final order in favor of State Farm on its request for declaratory relief, concluding it "owes no coverage for the judgment in the Underlying Action." After Gagliardo and Diblin's post-trial motions were denied, the court entered judgment in favor of State Farm on both its complaint and the pending cross-complaints.

III.

DISCUSSION

The parties do not dispute that the judgment in the underlying action is preclusive in this coverage action. (See *Executive Risk Indemnity, Inc. v. Jones* (2009) 171 Cal.App.4th 319, 325, fn. 7 [" 'In a new action on a *different*

12

cause of action, a former judgment is conclusive against the parties and persons in privity with them on issues litigated in the former action.' "].) Instead, the parties disagree about the meaning of the special verdict in the underlying action, and they thus disagree as to what, precisely, is to be given preclusive effect in this matter. After considering the first amended complaint, the jury instructions, and the special verdict form, the trial court ultimately determined the jury's verdict established that it found Diblin acted intentionally when he injured Gagliardo. This determination as to what the jury found in the underlying matter meant Gagliardo's injuries were not the result of an "occurrence" (i.e., "an accident") under the Policy, necessitating a no coverage finding in this matter.

Gagliardo and Diblin challenge the trial court's conclusion that the jury in the underlying case found Diblin acted intentionally when he struck Gagliardo. They first contend the jury's finding that Diblin was negligent necessitates a finding that the damages awarded in the underlying action are covered under the policy. According to appellants, the jury determined that it was only Diblin's negligence that caused Gagliardo's injuries, and therefore, because an "accident" includes negligence, coverage is mandated. In a related argument, Diblin argues that the trial court "simply misread the jury's verdict" in the underlying action when it concluded that the jury's punitive damages findings meant it had found Diblin acted with intent when he attacked Gagliardo. According to Diblin, because the jury "did not award punitive damages," the jury cannot be understood to have made a finding that would support the conclusion Diblin's conduct was intentional.

Second, appellants contend that even if this court determines the jury made a finding that Diblin's intentional conduct caused Gagliardo harm, such a finding should be considered to be an independent concurrent cause of the

13

damages. As this argument goes, under the doctrine of concurrent independent causation, coverage is required based on the jury's separate finding that he was also negligent.

Finally, appellants argue the trial court erred in finding that Insurance Code section 533 and/or the express exclusion for willful conduct set out in Section II of the Policy applied to exclude coverage for the damages awarded in the underlying action. They assert the trial court should have empaneled a new jury for the specific purpose of determining whether Diblin acted with a "preconceived design to injure," which, appellants assert, is necessary to a finding that the risk at issue is excluded by the intentional conduct exclusion set out in the Policy or imposed by Insurance Code section 533.

## A. The Trial Court Correctly Determined the Underlying Jury's Findings in the Special Verdict Form Preclude a Finding of Coverage

### 1. The Meaning of the Policy's Coverage Clause

"An insurance policy is written in two parts: the insuring agreement defines the type of risks which are covered, while the exclusions remove coverage for certain risks which are initially within the insuring clause." (*Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 802–803 (*Collin*).) "The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies." (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 322.)

In considering whether there is coverage for a particular risk or whether an exclusion applies to exclude a risk that would otherwise be covered, we must interpret and apply the language of the policy at issue. "Insurance policies are contracts and therefore subject to the rules of construction governing contracts. [Citation.] The goal of contractual

14

interpretation is to determine and give effect to the mutual intention of the parties." (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 762–763.)

Here, the Policy covers claims for damages made "because of bodily injury" that are "caused by an occurrence." The Policy defines an "occurrence" as an "accident." "[T]he meaning of the term 'accident' in a liability insurance policy is settled in California. '[A]n accident is " 'an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause.' " [Citations.] "This common law construction of the term 'accident' becomes part of the policy and precludes any assertion that the term is ambiguous." ' " (*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co.* (2018) 5 Cal.5th 216, 221 (*Liberty Surplus*), quoting *Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 308 (*Delgado*).)

" '[T]he word "accident" in the coverage clause of a liability policy refers to the *conduct of the insured* for which liability is sought to be imposed.' " (*Liberty Surplus, supra*, 5 Cal.5th at p. 221.) "When an insured intends the acts resulting in the injury or damage, it is not an accident 'merely because the insured did not intend to cause injury. . . . The insured's subjective intent is irrelevant.' " (*Albert v. Mid-Century Ins. Co.* (2015) 236 Cal.App.4th 1281, 1291.) "Because the term 'accident' refers to the insured's intent to commit the act giving rise to liability, as opposed to his or her intent to cause the consequences of that act, the courts have recognized—virtually without exception—that deliberate conduct is not an 'accident' or 'occurrence' irrespective of the insured's state of mind." (*Collin, supra*, 21 Cal.App.4th at p. 810.)

For example, the question in *Delgado, supra*, 47 Cal.4th at page 311, was whether an insured's unreasonable, subjective belief in the need for self-

15

defense converts an assault and battery into " 'an accident' " for purposes of an insurance policy that provides coverage for an "occurrence."  Like the Policy here, the policy at issue in *Delgado* defined an "occurrence" to mean " 'an accident.' " (*Id*. at pp. 308, 311.)  Answering the proposed question in the negative, the *Delgado* court explained that "an injury-producing event is not an 'accident' . . . when all of the acts, the manner in which they were done, and the objective accomplished occurred as intended by the actor." (*Id*. at pp. 311–312.)  Thus, where there had been no allegation that the battering acts "were merely shielding or the result of a reflex action," "the [victim's] injuries were not as a matter of law accidental." (*Id*. at p. 312.)

Because the Policy at issue in this case covers only injuries that result from "accidents," the relevant question for determining whether Gagliardo's injuries are covered under the Policy is whether those injuries were the result of intentional conduct or whether they instead resulted from an "accident."

### 2. *The Underlying Jury Found Diblin's Injurious Conduct was Intentional*

The trial court considered the operative pleading, the jury instructions and the jury's special verdict form to conclude that the judgment in the underlying case settled the question whether Gagliardo's injuries resulted from intentional conduct, not an accident.  On review, we consider the question of issue preclusion de novo. (See *Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 618 [determination as to whether issue preclusion applies is a question of law reviewed de novo].)

We begin by looking to the special verdict form.  As to the specific causes of action the jury was asked to consider, the jury found in favor of Diblin and against Gagliardo on Gagliardo's claims for the following intentional torts: sexual assault, sexual battery, and violation of the Ralph Act.  However, the jury found Diblin liable to Gagliardo on her intentional

16

tort claim for gender violence (Civ. Code, § 52.4). Because the intentional tort causes of action asserted in the first amended complaint, including the cause of action for gender violence, allowed for the imposition of punitive damages, the jury was also asked to determine whether Diblin's conduct warranted a punitive damage award. On the page of the special verdict form titled "Punitive Damages," the jury found that Diblin had engaged in "the conduct" both "with malice" and "with oppression."

Only after the jury answered all of the questions regarding the intentional tort theories of liability, was it then asked to make findings as to the only non-intentional tort Gagliardo had asserted—negligence. The jury answered "Yes" that Diblin had been "negligent," and it then agreed that Diblin's "negligence" was a "substantial factor" in causing Gagliardo's harm.

Finally the jury was asked to determine the amount of economic and noneconomic damages Gagliardo had proven.

The jury's finding that Diblin committed gender violence is a finding that he committed an *intentional* tort. (See 5 Witkin, Summary of Cal. Law (11th ed. 2025) Torts, § 548 [discussing claims for gender violence as a species of "Intentional Invasions of Interests in Personality"].) But even aside from the fact that a claim for gender violence sets out a claim for an intentional tort, one of the specific elements the jury found true was that Diblin engaged in the conduct "at least in part, based on [Gagliardo's] gender." In order to engage in conduct that is "based on" another person's gender, the defendant necessarily intended the conduct, negating the possibility that injuries resulting from gender violence were attributable to an "accident."

Moreover, even if the jury's finding on the gender violence claim was not enough itself to make clear that Diblin's liability for Gagliardo's injuries does not come within the Policy's coverage provision, the jury also found that

17

Diblin acted with both malice and oppression in injuring Gagliardo. The finding by the jury that Gagliardo had proven the elements necessary to entitle her to a punitive damage award also meant the jury necessarily concluded Diblin's conduct was deliberate and intentional, as "*accidentally harmful conduct cannot provide the basis for punitive damages under* [California] law." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1181, italics added.)

Diblin nevertheless contends the trial court "simply misread" the jury's verdict when it concluded the jury found Diblin acted intentionally. According to Diblin, because the jury did not *award* Gagliardo punitive damages, and instead awarded only "actual damages," one cannot conclude the jury made a finding that Gagliardo was *entitled* to punitive damages. Although it is true the jury did not award Gagliardo punitive damages, the lack of an award was not due to the jury rejecting the factual basis for such an award. The jury made the factual findings that punitive damages were warranted when it found Diblin acted with malice and oppression. But the jury was instructed that if it made the underlying factual finding necessary to award punitive damages it would be asked to set the amount of punitive damages at a later point in time, and Gagliardo ultimately waived her right to have the jury award her punitive damages. The lack of an award of punitive damages under these circumstances does not undermine the jury's factual findings that Diblin acted with malice and with oppression.

Appellants further contend that because the jury also made a finding Diblin was negligent, the jury must have necessarily concluded Gagliardo's injuries were caused unintentionally. They argue that only the negligence finding—and not the gender violence finding—should be given preclusive effect. Appellants rely on the fact the verdict form expressly asked the jury to

18

make a finding as to causation only with respect to the question of Diblin's negligence, but not with respect to the gender violence cause of action. This suggestion ignores the jury instructions and the entirety of the verdict form. For example, the jury was told, "You will be asked to decide whether Curtis Diblin *is liable to* Monee Gagliardo under the following legal theories" (italics added), and the instructions listed both "Gender Violence" and "Negligence" as two of the six possible legal theories for his liability. The jury was also instructed that it was only to decide whether Diblin's conduct "justified an award of punitive damages" if it "decide[d] that Curtis Diblin's conduct *caused* Monee Gagliardo harm." (Italics added.) Thus, in order to reach the questions about whether Diblin's conduct was done with malice, oppression or fraud, the jury had to first decide that this same conduct caused Gagliardo harm. Because the jury reached those punitive damages questions, it had decided that Diblin's violent conduct caused Gagliardo's injuries.

Nor do we agree with appellants' suggestion that the jury's determination as to negligence is inconsistent with its finding on the gender violence cause of action. When the verdict form is considered as a whole and understood through the framing of the operative pleading (see *Collin, supra*, 21 Cal.App.4th at p. 805 [to determine the nature of the conduct upon which a judgment is based, one must look to the pleading allegations]), it can be understood to reflect the jury's conclusion that Diblin engaged in intentional conduct when he attacked Gagliardo, and that this same conduct also met the standard for negligence set out in the jury instructions. The only conduct alleged to have caused Gagliardo's injuries in the first amended complaint was Diblin's assaultive conduct. Thus, every cause of action asserted by Gagliardo, including the cause of action for negligence, was based on Diblin's physical attack—not other conduct. And when the jury was asked to make

19

findings on these causes of action, it was not told that if it found there was liability for the attack under an intentional tort theory, the same conduct could not then also support a finding of liability based on negligence. Nor was the jury instructed that it could find Diblin negligent only if it determined the injury-producing conduct was unintended. Instead, the jury was told that negligence "is the failure to use reasonable care to prevent harm to oneself or to others," and that "[a] person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation." This expressed "failure to use reasonable care" standard is broad enough to include intentionally harmful conduct. In other words, under these instructions, a jury could conclude that a person who intentionally injures another person has also failed to use reasonable care to prevent injury to another. Thus, in the absence of any instruction telling the jury that a finding of liability for an intentional tort *precludes* a finding of negligence based on the same conduct, a determination that the defendant committed gender violence could also support a negligence finding, i.e., that the defendant did "something that a reasonably careful person would not do in the same situation."

There is thus no inconsistency in the jury's findings that Diblin was liable for Gagliardo's injuries under both an intentional tort theory and a negligence theory. And we have no reason to conclude the jury's answers to the special verdict questions regarding negligence should be understood to reflect a finding that Gagliardo's injuries were the result of *accidental* conduct. Rather, the verdict form and the jury instructions confirm that the jury believed Diblin's injury-producing conduct was deliberate and intentional *and* that this deliberate conduct constituted a breach of the duty

20

of care Diblin owed to Gagliardo. We therefore reject appellants' contention that the jury's negligence determination in the underlying case mandated a finding of coverage in this case.[3]

3.  *The Concurrent Independent Causes Doctrine Does Not Apply*

Relying on *State Farm Mut. Auto. Ins. Co. v. Partridge* (1973) 10 Cal.3d 94, 97 (*Partridge*), appellants next argue that a finding of coverage is compelled pursuant to the concurrent independent causes doctrine. Under this doctrine, an insurer has a duty to indemnify an insured if a covered risk is a proximate cause of the injury, even if a noncovered risk also jointly caused the injury in question.

According to appellants, there is no way to discern "that the conduct of Diblin the jury deemed to have been negligent is the same as whatever it deemed to have been malicious, so it is not at all clear the jury perceived there to be a *single* proximate cause" of Gagliardo's injuries. Thus, appellants suggest, the jury could have concluded that Diblin's negligent

---

[3]  We also reject Diblin's references to and reliance on the second amended complaint to provide any basis for understanding the jury's verdict in the underlying action. Although the superior court's clerk's office permitted the document to be filed approximately four years after judgment was entered in this case, it is clear this document cannot be given any legal effect. A plaintiff may only amend a pleading as a matter of course before an answer or demurrer is filed or before trial of the issue of law raised in the demurrer; after any of these things happens, "the plaintiff's right to amend as a matter of course is gone." (*Loser v. E.R. Bacon Co.* (1962) 201 Cal.App.2d 387, 389; see Code Civ. Proc., § 472.) At that point, the pleading can only be amended by obtaining permission of the court. (See Code Civ. Proc., §§ 472, 473.) The record does not demonstrate Gagliardo sought or obtained leave to file the purported second amended complaint in the underlying action when she submitted it for filing. Absent the court granting Gagliardo permission to amend the first amended complaint, the purported second amended complaint has no effect.

conduct was different from the conduct that the jury found to be malicious. And, their argument goes, even if the special verdict is interpreted as expressing that the jury found Diblin liable for an intentional tort (the gender violence cause of action), which is a noncovered cause of the injuries, the jury must have also found Diblin liable for different conduct amounting to negligence, which is a covered cause of the injuries.

In appellants' view, the evidence presented in the underlying trial not only supported a theory of liability based on gender violence, but also supported theories of liability related to Diblin's "negligent management of his own medical condition" or his negligent failure to warn Gagliardo that he was feeling out of sorts and aggressive that morning. They argue that negligence based on Diblin's failure to manage the effects of his testosterone medication or his failure to warn Gagliardo about those effects would be a covered risk under the Policy. According to appellants, the jury may have found him liable for these other types of conduct when the jury determined his negligence caused Gagliardo's injuries. However, *Partridge* and the law of concurrent independent causation does not assist appellants.

In *Partridge*, the insured was traveling in his car with a hunting gun he had modified to create a "hair trigger" action. After the insured drove the car off road, the car hit a bump and the gun fired, hitting and paralyzing a passenger, who sued. (*Partridge, supra*, 10 Cal.3d at pp. 97–98.) The insured's homeowner's liability policy covered liability resulting from the gun modification, but it did not cover injuries arising out of the use of a motor vehicle. (*Id*. at pp. 102–103.) The *Partridge* court concluded that the fact that the gun accidently fired in a car did not preclude coverage. (*Ibid*.) Rather, where two independent risks jointly caused the injury, the insurer is liable so long as one of the risks is covered by the policy. (*Id*. at pp. 102–103.)

22

The *Partridge* court explained that "although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries. . . . [I]nasmuch as the liability of the insured arises from his non-auto-related conduct, and exists independently of any 'use' of his car, we believe the homeowner's policy covers that liability." (*Id.* at p. 103.)

Concurrent independent causes "are multiple forces operating at the same time and independently, *each of which would have been sufficient by itself to bring about the harm.*" (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1240, italics added.) Therefore, "[c]ourts following *Partridge* have made it clear that its holding applies to 'multiple causes that operated totally independently of one another.' " (*Medill v. Westport Ins. Corp.* (2006) 143 Cal.App.4th 819, 835, citing *State Farm Fire & Cas. Co. v. Kohl* (1982) 131 Cal.App.3d 1031, 1039 and *Underwriters Ins. Co. v. Purdie* (1983) 145 Cal.App.3d 57, 68.)

Thus, for example, in *Safeco Ins. Co. v. Gilstrap* (1983) 141 Cal.App.3d 524, 530 (*Safeco*), the court distinguished *Partridge* on the ground the asserted concurrent causes were not independent of one another. The two asserted concurrent negligent acts at issue were the insured parents' negligent entrustment of a motorcycle to their 14-year-old son, and the son's negligence in operating the motorcycle when he collided with another motorcycle and injured a third party. (*Id.* at pp. 526, 527.) As the *Safeco* court explained, "[t]he separate and independent act in *Partridge* giving rise to liability was a 'non-auto-related act,' i.e., the filing of the gun trigger[, and t]hat act had nothing to do with the use or operation of a vehicle." (*Id.* at p. 527.) "In contrast to *Partridge,* the obligation of the insureds" in *Safeco* "did not arise from an act separate and independent from the use of the

23

vehicle itself," as the parents' conduct in negligently entrusting the vehicle to their minor son could not "be disassociated from the use of the vehicle itself." (*Id*. at pp. 527–528.) Ultimately the *Safeco* court determined the asserted covered risk was not a concurrent *independent* cause of the third party's injury, as "the injury here involved no instrumentality other than the vehicle itself and . . . there would have been no accident without the use or operation of the motorcycle." (*Id*. at pp. 530–531.)

And similarly in *Farmers Ins. Exchange v. Superior Court* (2013) 220 Cal.App.4th 1199 (*Farmers*), the court explained why the *Partridge* rule did not mandate coverage. The underlying claim in *Farmers* arose from the accident in which a grandfather ran over his granddaughter with his pickup truck. (*Id*. at pp. 1204–1212.) There, the court considered whether the grandfather's negligent operation of his truck and the grandmother's negligent supervision of a child were independent concurrent causes of the child's fatal injuries. (*Id*. at p. 1208.) The *Farmers* court determined the causes were *not* independent, and the homeowner's policy exclusion for injuries arising from use of a motor vehicle therefore applied. It explained that in similar cases finding coverage barred, the excluded instrumentality "played an active role in causing the injury," and the injury " 'involved no instrumentality other than the [excluded instrumentality the] vehicle itself,' and 'there would have been no accident without the use or operation of' the vehicle." (*Id*. at p. 1209, quoting *Safeco, supra*, 141 Cal.App.3d at p. 530.) The court found the grandmother's "negligent supervision was not 'separate and independent' of [the grandfather's] negligent automobile use because there was only one way, one place, and one time [the grandmother's] negligence could give rise to liability: when [the grandfather] arrived home in his truck." (*Farmers*, at p. 1212.)

24

Applying *Partridge* and subsequent cases considering its rule, we must reject appellants' contention regarding the applicability of the concurrent independent causes doctrine. As a preliminary matter, as we have already explained, we are unconvinced the jury's verdict reflects that it was holding Diblin liable for two separate types of conduct when it found that Diblin committed gender violence and that he acted negligently. Again, the jury was not told that finding specific damage-producing conduct was intentional would preclude them from also finding that the same conduct was negligent. Absent an instruction that a finding of liability on any of the intentional tort theories would prevent a finding of negligence based on the same asserted conduct, one cannot presume that the jury relied on two different sets of conduct in finding that Diblin was liable for an intentional tort and for his negligence.

But even if we were to assume for the sake of argument that appellants were correct that the jury's verdict could be interpreted as reflecting that the jury found Diblin liable to Gagliardo based on two separate acts or omissions (one being his intentionally violent conduct and the other being his mismanagement of his medication and/or his failure to warn Gagliardo about the side effects he was experiencing), the concurrent independent causes rule does not apply because the purported noncovered and covered causes of the injury are not *independent* of each other. Appellants' argument is that the jury could have found Diblin liable on the gender violence cause of action based on his conduct of deliberately striking Gagliardo with a mallet, and that it also could have found him liable for negligence based on his failure to warn Gagliardo or his failure to seek additional medical care to reduce the side effects of the testosterone. But unlike in *Partridge*, where the negligent filing of the gun's trigger mechanism and the negligent driving each could

have separately resulted in injury (see *Partridge*, *supra*, 10 Cal.3d at p. 103), the failure to address the side effects of the testosterone or to warn Gagliardo about his experience of the violent side effects were not risks that themselves could have caused Gagliardo harm. It is only when these omissions are coupled with Diblin's violent conduct that any injury could have possibly resulted. In fact, Diblin's theory of the role of his purported negligence regarding the side effects of the testosterone demonstrates the interdependency of these two purported concurrent causes. Under Diblin's theory of what occurred, his aggression was a side effect of the testosterone treatment, and it was this medication-induced aggression that *led to* his violent conduct—conduct the underlying jury found constituted the intentional tort of gender violence. Thus, possible testosterone-related negligence was "integrally connected to" (*Prince v. United National Ins. Co.* (2006) 142 Cal.App.4th 233, 245) Diblin's intentional violent conduct, not independent of it. Consequently, the concurrent independent causes rule set out in *Partridge* does not apply to mandate coverage, even assuming the jury in the underlying case found that Diblin was liable for Gagliardo's injuries based on the separate types of purportedly negligent conduct appellants' identify on appeal.

*4. There Is No Need for a New Jury to Decide Whether Diblin Acted with a "Preconceived Design to Injure"*

In their final argument, appellants contend the trial court should not have decided that Insurance Code section 533[4] and/or the express exclusion for willful conduct set out in Section II of the Policy apply to exclude coverage for the damages awarded in the underlying action. For example, appellants rely on *Walters v. American Insurance Co.* (1960) 185 Cal.App.2d 776 and *Meyer v. Pacific Employers Ins. Co.* (1965) 233 Cal.App.2d 321, among others, to assert the trial court should have empaneled a new jury for the specific purpose of determining whether Diblin acted with a "preconceived design to injure." According to appellants, these authorities require a jury to find that Diblin acted with a "preconceived design to injure" before the particular risk from that conduct can be *excluded* from coverage under the Policy's willful conduct exclusion or the similar exclusion implied by Insurance Code section 533.

Even assuming the cited authorities remain valid and that they require a finding that Diblin acted with "preconceived design to injure" before a willful acts exclusion may prevent coverage, there is no need for a jury to make such a determination in this case. If a claim is not covered under a policy's coverage provisions, then there is no need to consider whether the claim would be excluded under an exclusion provision. (See *Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1497.) As we have already

---

[4]    Insurance Code section 533 provides, "An insurer is not liable for a loss caused by the willful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." This provision operates as " 'an implied exclusionary clause which by statute is to be read into all insurance policies.' " (*J.C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1019.)

determined, the jury's verdict in the underlying case establishes that Gagliardo's injuries were not the result of an "occurrence" under the Policy's *coverage* provision. Because the claim does not come within the coverage provision, there is no need to consider the express exclusion provision in Section II of the Policy or the exclusion implied in every policy by Insurance Code section 533. Thus, the trial court made no error in declining to empanel a new jury to determine whether Diblin acted with a "preconceived design to injure."

IV.

DISPOSITION

The judgment of the trial court is affirmed. Respondent shall recover costs.

McCONNELL, P. J.

WE CONCUR:

DO, J.

KELETY, J.

28